

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. RS 06-12181 DN |
| | Adv. No. RS 06-01271 DN |
| JAMES J. LONDAGIN | |
| DEBRA A. LONDAGIN | |
| | Chapter 7 |
| Debtors. | |
| | MEMORANDUM OF DECISION |
| SOUTHERN CALIFORNIA | |
| REINVESTMENT FUND, CDFI | |
| | |
| Plaintiff. | |
| v. | |
| JAMES J. LONDAGIN | |
| DEBRA A. LONDAGIN | |
| | |
| Defendants. | |

Plaintiff, Southern California Reinvestment Fund, CDFI ("CDFI"), filed a complaint against the debtors, James J. Londagin and Debra A. Londagin, to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B) and § 523(a)(6).[1]  Trial was held on March 5, 2008.  The Court has considered the documentary evidence, testimony of witnesses, including an assessment of the credibility of the witnesses,

---

[1] Unless otherwise indicated all Code, chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330.

1  arguments and briefing by counsel and makes the following
2  findings and conclusions pursuant to Fed. R. Civ. P. 52 as
3  incorporated by Fed. R. Bank.P. Rule 7052:

4                        I. Findings of Fact

5      On March 30, 2004, Mr. and Mrs. Londagin dba Empire Gardens
6  executed a lease with Foothill Retail Center, LLC for commercial
7  property located on Foothill Boulevard in Upland, California for
8  a lease term of ten years ("Foothill Property").  Max Taylor and
9  Co. III, LLC is the successor in interest to Foothill Retail
10 Center, LLC (collectively, " the Landlord").

11     Mrs. Londagin was employed full-time by the Ontario/
12 Montclair School District and was not involved in the operation
13 of Empire Gardens.  She executed certain loan documents, the
14 security agreement and the deed of trust.  The business license
15 for Empire Gardens was issued in the names of Mr. and Mrs.
16 Londagin.  Mrs. Londagin testified that she executed certain
17 documents at the request of her husband without knowledge of
18 their content.  CDFI presented no evidence to demonstrate that
19 Mrs. Londagin was involved in the operation of Empire Gardens,
20 or more importantly, that she had the intent to publish false
21 information regarding financial condition.  The fact that the
22 business license and insurance for Empire Gardens was issued in
23 the name of Mr. and Mrs. Londagin is insufficient to establish
24 an agency or partnership relationship independent of the marital
25 relationship.  It is clear that Mrs. Londagin had no management
26 or control over Empire Gardens.  Mr. Londagin began operating
27 Empire Gardens out of the Foothill Property location and
28 continued to operate the business from that location until March

                              2

1 | of 2005 when he could no longer afford the rent.  Mr. Londagin
2 | testified that he spoke with the property manager about vacating
3 | the Foothill Property, gave thirty days notice, was told by the
4 | property manager that he could vacate the Foothill Property and
5 | the property manager would talk to the Landlord on his behalf.
6 | Mr. Londagin testified that he believed he had no liability
7 | pursuant to the lease notwithstanding the abandonment of the
8 | Foothill Property.  I find that this testimony is not credible.

9 | Subsequently, on April 1, 2005, Mr. Londagin dba Empire
10 | Gardens entered into a new lease for commercial property located
11 | on Euclid Avenue in Upland, California ("Euclid Property") for a
12 | term of five years and began operating Empire Gardens from the
13 | Euclid Property.

14 | In July of 2005, Mr. Londagin sought to obtain a loan and
15 | began discussions with CDFI.  Stacey Sanchez, executive
16 | director of CDFI, had numerous conversations with Mr. Londagin
17 | regarding the loan.  Mr. Londagin prepared and submitted to CDFI
18 | a personal financial statement, a loan application, profit and
19 | loss statements for Empire Gardens, and a balance sheet for
20 | Empire Gardens, among other things.  Mr. Londagin represented
21 | orally and in writing that he intended to use approximately
22 | $14,000 of the loan proceeds to purchase a large floral
23 | refrigeration unit ("Equipment").  He never purchased the
24 | Equipment because business was declining and there was no longer
25 | a need to expand.

26 | Based upon the oral and written representations of Mr.
27 | Londagin, including the representations in the personal
28 | financial statement, loan application, balance sheet and profit

3

1  and loss statements for Empire Gardens, Ms. Sanchez, as loan

2  officer, and on behalf of CDFI, granted Mr. and Mrs. Londagin a

3  loan in the amount of $60,000 ("Loan").  The promissory note

4  ("Note") was executed by Mr. and Mrs. Londagin on December 6,

5  2005 and the parties admit that the terms of the Note were

6  breached on May 1, 2006.  Mrs. Londagin executed the Note at the

7  direction of Mr. Londagin because he asked her to do so.  She had

8  no involvement with the preparation or submission of the personal

9  financial statement, loan application or other related documents

10 and made no representations with regard to the information

11 contained therein.

12     Mr. and Mrs. Londagin executed two commercial security

13 agreements in connection with the Note granting CDFI a first

14 priority security interest in all personal property of Empire

15 Gardens as well as two vehicles.  CDFI perfected its security in

16 the personal property by filing a UCC-1 financing statement and

17 placed its name on title as lienholder with respect to the

18 vehicles.  CDFI also obtained a third deed of trust on Mr. and

19 Mrs. Londagin's residence located in Ontario, California.

20     On July 19, 2005, a demand letter was written to Mr. and

21 Mrs. Londagin by counsel to the Landlord indicating that they

22 were in breach of the lease for the Foothill Property  and

23 currently indebted in the sum of approximately $54,000.  The

24 letter indicated that, if arrangements for payment were not made,

25 litigation would be initiated.  On 8/25/05, a second letter was

26 written to Mr. and Mrs. Londagin by counsel to the Landlord

27 requesting a response to the prior letter and advising that if no

28 response was received within ten days, they would take legal

4

1  action without further notice.

2      Mr. Londagin denied knowledge of the letters.  I find that

3  Mr. Londagin's testimony on this issue is not credible.  It is

4  not plausible that: (1) Mr. Londagin believed he could walk away

5  from a commercial lease for a term of ten years with no liability

6  thereon, and (2) that demand letters to Mr. and Mrs. Londagin by

7  counsel to the Landlord were written but never sent and/or

8  received.  In May of 2006, the Landlord filed a lawsuit against

9  Mr. and Mrs. Londagin dba Empire Gardens praying for damages for

10  breach of the lease in the amount of approximately $128,250.

11  Mr. and Mrs. Londagin were served with process in June of 2006;

12  Mr. Londagin testified that he was unaware of any liability

13  regarding the Foothill Property lease until that time.  I reject

14  this testimony and find that Mr. Londagin knew of his obligation

15  at the time he was preparing documents in anticipation of

16  obtaining the Loan from CDFI.

17      The evidence reflects that Mr. Londagin walked away from

18  the Foothill Property lease, which was for a term of ten years,

19  after little more than one year.  Subsequently, he executed the

20  Euclid Property lease, which was for a term of five years, and

21  walked away from the Euclid Property lease after approximately

22  one year.  In fact, he vacated the Euclid Property without

23  advising Ms. Sanchez, who discovered the abandonment when she

24  visited the Euclid Property once the payments on the Loan were in

25  default.  Mr. Londagin testified that he believed that he had

26  oral agreements with the respective landlords so that he could

27  vacate the premises without any liability; in both cases he was

28  wrong.  The evidence further indicates that Mr. Londagin is a

1  sophisticated businessman who executed a lease of approximately

2  thirty pages for the Foothill Property, which contained specific

3  provisions in the event of default.  Mr. Londagin knew that he

4  had an outstanding obligation to the Landlord at the time he

5  sought to obtain the Loan from CDFI.

6      Mr. Londagin prepared: (1) the personal financial statement,

7  dated 7/22/05, for purposes of obtaining the Loan, and (2) the

8  balance sheet, dated August 1, 2005, for Empire Gardens for

9  purposes of obtaining the Loan.  He failed to list any liability

10  to the Landlord on either document notwithstanding his knowledge

11  that he was indebted to the Landlord in the sum of approximately

12  $54,000 at that time as a result of the default and damages would

13  continue to accrue.  The personal financial statement provided a

14  section entitled  "Other Liabilities," which was left blank by

15  Mr. Londagin.

16      CDFI relied upon the personal financial statements, balance

17  sheet and other related documents.  CDFI would never have granted

18  the Loan to Mr. and Mrs. Londagin had the breach of the Foothill

19  Property lease and obligation thereon been disclosed.  Mr.

20  Londagin had numerous conversations with Ms. Sanchez during the

21  period from July of 2005 through December 2005 when the Note was

22  executed.  During this process, he failed to disclose any

23  obligation or liability on the Foothill Property lease.

24      Mr. and Mrs. Londagin agreed to turn over the two vehicles

25  to CDFI or repair and sell the vehicles and informed CDFI's

26  counsel of their intent at the 341(a) hearing.  Mr. Londagin

27  testified that the vehicles were always available and that he

28  kept them in storage.  He further testified that one vehicle was

6

1  repaired, and he attempted to sell it by placing a for sale sign

2  in the window of the vehicle.  CDFI's counsel sent two demand

3  letters to Mr. and Mrs. Londagin's bankruptcy counsel demanding

4  turnover of the vehicles;  Mr. Londagin testified that he was not

5  aware of the demand letters sent to his counsel, which I find

6  unbelievable.  Approximately one year later, Mr. Londagin turned

7  over the vehicles.  All personal property collateral was sold at

8  auction in December of 2007.  The proceeds of the auction totaled

9  $2,800.75.  Following deductions for expenses and commissions,

10  CDFI received a check in the amount of $100.99.

11                    II. Conclusions of Law

12      A plaintiff bears the burden of establishing an exception

13  to discharge by a preponderance of the evidence.  Grogan v.

14  Garner, 498 U.S. 279, 287 (1991).

15             (A)  Section 523(a)(2)(A) and (a)(2)(B)

16      Section 523(a)(2)(A) and (a)(2)(B) state, in relevant

17  part:

18          A discharge under section 727...of this title
            does not discharge an individual debtor from
19          any debt-

20          (2) for money, property, services, or an
            extension, renewal, or refinancing of credit
21          to the extent obtained by-

22              (A) false pretenses, a false representation,
                or actual fraud, other than a statement
23              respecting the debtor's or an insider's
                financial condition;

24              (B) use of a statement in writing-

25                  (i)    that is materially false;

26
                    (ii)   respecting the debtor's or
27                         an insider's financial condition;

28                  (iii)  on which the creditor to whom

                              7

the debtor is liable for such
money, property, services, or
credit reasonably relied; and

(iv)    that the debtor caused to be made
or published with intent to deceive...

Section 523(a)(2)(A) refers to representations other than

those respecting the debtor's financial condition; Section

523 (a)(2)(B) refers to written statements respecting the

debtor's financial condition. <u>In re Kirsh</u>, 973 F.2d 1454, 1457

(9th Cir. 1992).

(i)  <u>Section 523(a)(2)(A)</u>

To prevail on a § 523(a)(2)(A) claim, a plaintiff must

prove that "(1)the debtor made the representations, (2) that at

the time he knew they were false, (3) that he made them with the

intention and purpose of deceiving the creditor, (4) that the

creditor relied on such representations, and (5) the creditor

sustained the alleged loss and damage as the proximate result of

the representations having been made." <u>Britton v. Price, (In re</u>

<u>Britton)</u>, 950 F.2d 602, 604 (9th Cir. 1991).

CDFI testified that Mr. Londagin told Ms. Sanchez that he

intended to use $14,000 of the loan proceeds to purchase

Equipment.  Mr. Londagin testified that he did, in fact, make the

representation to Ms. Sanchez and that he intended to purchase

the Equipment at the time the representation was made.  He

further testified that subsequently business decreased and he no

longer required the Equipment.

CDFI bears the burden to establish that at the time Mr.

Londagin made the statement he knew it was false.  CDFI

presented no evidence to impeach the testimony of Mr. Londagin on

1 this issue.  Because I find that CDFI failed to meet its burden
2 on this second element, the analysis under § 523(a)(2)(A) ends
3 here.  Accordingly, CDFI has failed to prove that the debt is
4 nondischargeable under § 523 (a)(2)(A).

5                          (ii) Section 523(a)(2)(B)

6       To prevail under § 523(a)(2)(B), a plaintiff must prove
7 the elements as required under § 523(a)(2)(A) in addition to the
8 use of a written statement regarding the debtor's financial
9 condition.  Siriani v. Northwestern Natl. Ins. Co. (In re
10 Siriani), 967 F.2d 302, 304 (9th Cir. 1992).  The reliance under
11 this section must be reasonable.  Candland v. Ins. Co. of N. Am.
12 (In re Candland), 90 F.3d 1466, 1471 (9th Cir. 1996).

13       "'Material falsity' in a financial statement can be
14 premised ... upon the omission of information about a debtor's
15 financial condition."  In re Greene, 96 B.R. 279, 283 (9th Cir.
16 BAP 1989).  "A statement can be materially false if it includes
17 information which is 'substantially inaccurate' and is of the
18 type that would affect the creditor's decision making process.
19 To except a debt from discharge, the creditor must not only show
20 that the statements are inaccurate, but also that they contain
21 important and substantial untruths."  Candland, 90 F.3d at 1470.
22 (citing In re Greene, 96 B.R. 279, 283 (9th Cir. BAP 1989)
23 (citations and quotations omitted).

24       In completing the personal financial statement, Mr. Londagin
25 left the space under "Other Liabilities" blank.  The document was
26 dated July 22, 2005, several months after Mr. Londagin defaulted
27 on the lease and several days after the date of the July demand
28 letter wherein the Landlord demanded payment for the prior months

                                   9

rent following the abandonment of the premises and breach of the Foothill Property lease. CDFI would not have extended the Loan had this obligation been disclosed because it would impact the ability to repay the Loan, cause CDFI to question the character of the borrower, and it would have been concerned about a lawsuit, potential judgments and liens. CDFI has demonstrated by a preponderance of the evidence that Mr. Londagin knew he had an existing liability as a result of the breach of the Foothill Property Lease. By failing to disclose this information in the personal financial statement, Mr. Londagin succeeded in providing information to CDFI that was "substantially inaccurate" as well as "important and substantial untruths." Id. In effect, omission of the true nature of the liabilities of Mr. and Mrs. Londagin by Mr. Londagin were simply false, he knew the omission was false and led CDFI to believe that the only existing liabilities were an existing mortgage and auto loan in the amount of $428,800 with assets listed in the amount of $852,000.

"Material misrepresentations for this statutory section are substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision." Id. at 1470. Here, Ms. Sanchez testified that the Loan never would have been made had the liability been disclosed. In Candland, the court concluded that misrepresentations of financial condition of several hundred thousand dollars were sufficient to affect a lender's decision. Id. In this case, the Loan amount was $60,000 and the existing liability, as of July of 2005, as known to Mr. Londagin was $54,000 with further damages continuing to accrue. Absent the false statement regarding

1  financial condition, the Loan would not have been granted.

2  Intent to deceive may be inferred from the "surrounding
3  circumstances" as direct proof is generally not available.
4  Tustin Thrift & Loan Assn. v. Maldonado (In re Maldonado), 228
5  B.R. 735, 738 (9th Cir. BAP 1999).  At the time the personal
6  financial statement and related documents were completed, Mr.
7  Londagin had already abandoned the Foothill Property and executed
8  the lease for the Euclid Property, which he later abandoned.
9  During the time period in which he was preparing the personal
10 financial statement, a letter was written by counsel for the
11 Landlord advising Mr. and Mrs. Londagin of the breach of the
12 Foothill Property lease, the amount of indebtedness and the
13 intent to pursue legal remedies.  The circumstantial evidence
14 supports a finding of intent to deceive.

15 Mr. Londagin seems to have a pattern of breaching leases
16 and then considering a discussion with some representative of
17 the landlord to be equivalent of an agreement that liability
18 is exonerated.  Since Mrs. Londagin's involvement in the
19 business is passive and her information about the leases is
20 filtered through Mr. Londagin, I do not find the requisite
21 intent to deceive on her part.

22 CDFI also bears the burden to establish that it reasonably
23 relied upon the misrepresentation and it proximately caused the
24 damages.  Id. (citing Siriani, 967 F. 2d at 304).

25 The plain language of § 523(a)(2)(B) requires reasonable
26 reliance.  In analyzing this element and considering whether
27 there is a duty to investigate, the Ninth Circuit has determined
28 that a lender's reliance on a financial statement was reasonable

1  where the lender undertook efforts to verify the financial status
2  of the borrower notwithstanding that the investigation failed to
3  reveal the fraud.  <u>La Trattoria, Inc. v. Lansford (In re</u>
4  <u>Lansford)</u>, 822 F. 2d 902, 904 (9th Cir. 1987); <u>Candland</u>, 90 F.3d
5  at 1471 (the duty to investigate was easily satisfied).

6      Similarly, in this case, CDFI relied upon the personal
7  financial statement, which proved to be false.  CDFI accepted Mr.
8  and Mrs. Londagin's statement of value regarding their residence.
9  Under the circumstances, an investigation of the value of assets,
10 i.e., an appraisal of the residence, would not have revealed the
11 fraud.  The fraud was the complete omission of a liability for
12 breach of the Foothill Property lease.  An investigation of
13 lawsuits and judgments would not have revealed the fraud as the
14 lawsuit had not been filed.

15     Mr. and Mrs. Londagin contend that CDFI did not, in fact,
16 rely upon the representation contained in the financial
17 documents, but instead relied upon the security provided in
18 exchange for the Loan.  The facts belie such a conclusion.  CDFI
19 was secured by a third deed of trust on the Property, a UCC-1
20 financing statement on the personal property, and as lienholder
21 on the two vehicles.  The Property was foreclosed upon by the
22 senior lienholder, and CDFI received a total of $100.91 from
23 auction of the personal property, which included the two
24 vehicles.  Moreover, even if CDFI relied, in part, upon the
25 security, it does not preclude CDFI from also relying upon the
26 representation of liabilities to be accurate in assessing the
27 financial condition of prospective borrowers in deciding whether
28 to grant the Loan, which it clearly did.

1    In _Siriani_, the Ninth Circuit adopted the analysis as
2  applied by the Eleventh Circuit in _Collins v. Palm Beach Savings
3  and Loan (In re Collins)_, 946 F.2d 815, 816 (11th Cir. 1991) in
4  considering the element of proximate cause.  In _Collins_, the
5  debtor submitted a false financial statement to the bank and the
6  bank provided a loan based on the false financial statement.  The
7  loan was secured by personal property, which was over-encumbered
8  and not disclosed to the bank.  Following the debtor's bankruptcy
9  filing, the Eleventh Circuit affirmed the bankruptcy court's
10 nondischargeability determination and found that "the debtor's
11 fraud and not the bank's failure to perfect was the proximate
12 cause of the bank's losses."  _Siriani_, 967 F.3d at 306 (citing
13 _Collins_, 946 F.2d at 815-16).

14   In applying a similar analysis, the Ninth Circuit concluded
15 that the creditor must show "that the fraud proximately caused
16 its loss by adducing evidence that it relied on the financial
17 statements, that it had valuable collection remedies at the time
18 of renewal [of the bond], and that such remedies lost value
19 during the renewal period."  _Id_. at 306.

20   The Ninth Circuit has explained proximate cause in
21 _In re Britton_ as follows:

22         Proximate cause is sometimes said to depend
           on whether the conduct has been so significant
23         and important a cause that the defendant should
           be legally responsible.  But both significance
24         and importance turn upon conclusions in terms
           of legal policy so that they depend on whether
25         the policy of the law will extend the responsibility
           for the conduct to the consequences which have in
26         fact occurred.

27 _In re Britton_, 950 F.2d 602, 604 (9th Cir. 1994) quoting W. Page
   Keeton et. al., Prosser _and Keeton on the Law of Torts_ § 42 at
28 273 (5th ed. 1984).

But for the omission in the financial documents, CDFI would never have made the Loan.  The default on the Loan caused the loss to CDFI.  Default is a foreseeable result where a borrower has provided a material misrepresentation with the intent to deceive the lender upon which the lender reasonably relied when the borrower failed to disclose the true nature of its liabilities and financial condition.  This is particularly true where, as here, Mr. and Mrs. Londagin had defaulted on the Foothill Property lease prior to applying for the Loan with CDFI and also defaulted on the Euclid Property lease.

Subsequently, the Landlord filed a lawsuit seeking more than $100,000 in damages and prompting this bankruptcy filing. The Euclid Property landlord filed a claim in the bankruptcy case.  The fraud allowed Mr. and Mrs. Londagin to obtain the Loan from CDFI that otherwise would never have been approved; the fraud caused CDFI to act and proximately caused the damage to CDFI.  There is no legal policy reason to limit the liability of Mr. Londagin for this debt.

The plain language of the statute requires an intent to deceive.  Fraud is not imputed from one spouse to another absent a finding of agency relationship.  Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 258 B.R. 192 (9th Cir. BAP 2001) ("Tsurukawa I");  Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515 (9th Cir. BAP 2002) ("Tsurukawa II") (fraud may be imputed to a spouse under partnership and agency principles for purposes of § 523(a)(2)(A)); La Trattoria, Inc. v. Lansford (In re Lansford), 822 F.2d 902, 904 (9th Cir. 1987) (fraudulent intent of wife was proven where husband presented

14

1  false financial statement).

2      Mrs. Londagin was employed by the Ontario/Montclair School
3  District and asserted no management or control over Empire
4  Gardens; no agency or partnership relationship existed.   She did
5  not prepare the personal financial statement or related documents
6  and did not participate in the misrepresentation regarding the
7  liability.   There is no evidence of fraudulent intent as to Mrs.
8  Londagin.   Accordingly, I find that the debt is nondischargeable
9  pursuant to § 523(a)(2)(B) as to Mr. Londagin only.   The debt
10  is determined to be $58,235.25, plus interest at the California
11  legal rate from May 6, 2006 to the date of entry of the judgment
12  and at the federal rate thereafter.

13                      (iii) <u>Section 523(a)(6)</u>

14      Section 523(a)(6) provides, in relevant part, that a
15  discharge under § 727 does not discharge an individual debtor
16  from any debt for willful and malicious injury by the debtor to
17  another entity or to the property of another entity.   Section
18  523(a)(6).   Conversion "constitutes a willful and malicious
19  injury within the meaning of § 523(a)(6)."   <u>Del Bino v.</u>
20  <u>Bailey (In re Bailey)</u>, 197 F. 3d 997, 1000 (9th Cir. BAP 1999)
21  (citations omitted).   "One who wrongfully withholds personal
22  property from another who is entitled to it under a security
23  agreement may be liable for conversion."   <u>Messerall v. Fulwider</u>,
24  199 Cal. App. 3d. 1324, 1329, 245 Cal. Rptr. 548 (Cal. Ct. App.
25  1998) (citing <u>Hartford Financial Corp. v. Burns</u>, 96 Cal. App. 3d
26  591, 598, 158 Cal. Rptr. 169 (Cal. Ct. App. 1979).   To establish
27  a claim for conversion of personal property plaintiff must prove:
28  " (1) plaintiff's ownership or right to possession of the

1  property at the time of conversion, (2) defendant's conversion by

2  a wrongful act or disposition of plaintiff's property rights, and

3  (3) damages." Messerall, 199 Cal. App. at 1329.

4      CDFI contends that it proved a willful and malicious injury

5  pursuant to § 523(a)(6) when Mr. and Mrs. Londagin failed to

6  either turnover the personal property, including the two

7  vehicles, or repair and sell the vehicles and turnover the

8  proceeds of sale.

9      It is undisputed that CDFI had a lien on the personal

10 property and an interest therein.  CDFI indicated that Mr.

11 Londagin promised to turnover the property or proceeds at the

12 341(a) hearing.[2]  At that time, the property was property of the

13 estate as defined pursuant to § 541(a).  CDFI, as a secured

14 creditor, had certain remedies available to it within the

15 confines of the bankruptcy court, including filing a motion for

16 relief from the automatic stay, if it wished to obtain

17 immediate possession.  Instead, CDFI, through counsel, had

18 conversations with Mr. and Mrs. Londagin.  Mr. Londagin

19 testified that he never saw the letters sent to his attorney

20 by counsel for CDFI demanding turnover of the property and was

21 not aware of the letters prior to trial.  He further testified

22 that the property was always available.  He took one of the

23 vehicles to be repaired and attempted to sell one of the vehicles

24

25      [2] The Court takes judicial notice of the docket, which
   reflects that the petition was filed on August 16, 2006; 341(a)
26 was held and concluded on September 28, 2006; CDFI filed a motion
   for relief from automatic stay re personal property on November
27 17, 2006, which was granted on December 12, 2006.

28

by placing a for sale sign in the window of the vehicle.  CDFI
was not particularly effective in recovering its collateral, and
perhaps again suffered by relying on Mr. Londagin to be an
upstanding debtor rather than a person whose actions demonstrate
that he is disingenuous and deceptive.  CDFI's reliance on Mr.
Londagin and his counsel was misplaced.

As to the first element of conversion, the plaintiff's
ownership or right to possession of the property at the time of
conversion: CDFI presented no evidence to prove when the alleged
conversion occurred other than that Mr. and Mrs. Londagin
promised at the 341(a) to return the vehicles and/or make
arrangements to sell the vehicles and turnover the sale proceeds.
CDFI was not entitled to immediate possession of the property at
the time of the 341(a) hearing.  A motion for relief from the
automatic stay was not filed until November of 2006.

Nor has CDFI demonstrated that Mr. and Mrs. Londagin
converted the vehicles by a wrongful act or disposition of
its property.  There were no terms or conditions set forth by
CDFI as to the manner of sale nor a deadline set for date of
sale.  While Mr. Londagin's efforts demonstrate a less than
enthusiastic approach to effect a sale or turnover, the actions
do not rise to the level to establish the tort of conversion
under the heightened requirements of § 523(a)(6).

Accordingly, CDFI has failed to prove that the debt is
nondischargeable pursuant to § 523 (a)(6).

### Attorney's Fees

CDFI seeks attorney's fees.  Attorney's fees shall be
pled as a claim in a complaint.  Fed. R. Bank. P. 7008(b).

CDFI has included a request for attorney's fees within the § 523

claims in lieu of a separate claim.  "A pretrial order 'has the

effect of amending the pleadings.'"  <u>First Card v. Hunt (In re</u>

<u>Hunt)</u>, 238 F.3d 1098, 1101 (9th Cir. 2001) (citing <u>999 v. CIT</u>

<u>Corp.</u>, 776 F.2d 866, 871 n.2 (9th Cir. 1985)).

    The parties admit in the Joint Pretrial Order that Mr.

and Mrs. Londagin breached the terms of the Note by failing to

make the May 1, 2006 payment and each payment thereafter and

further admit that $58,235.25 plus interest and other charges,

including attorney's fees are due.

    The "American Rule," as codified pursuant to Cal. Code Civ.

Pro. § 1021, provides, in relevant part, that except as provided

by statute, compensation of attorneys is left to the agreement of

the parties.  Cal. Code Civ. Pro. § 1021.  The Note includes an

attorney's fee provision as follows:

> Lender may hire or pay someone else to help
> collect this Note if Borrower does not pay.
> Borrower will pay Lender that amount.  This
> includes, subject to any limits under applicable
> law, Lender's attorney's fees and Lender's
> legal expenses, whether or not there is a
> lawsuit, including attorney's fees, expenses
> for bankruptcy proceedings (including efforts
> to modify or vacate any automatic stay or
> injunction), and appeals.  Borrower also will
> pay any court costs, in addition to all other
> sums provided by law.

Plaintiff's Exhibit 1.

    Because it is undisputed that the terms of the Note were

breached and the agreement provides for payment of attorney's

fees and costs, the Court need only determine that the provision

for attorney's fees is in accord with state law and determine

whether the debt for attorney's fees is nondischargeable.  The

1   language contained in the agreement is extremely broad and

2   permits recovery of attorney's fees to collect on the Note,

3   including whether or not there is a lawsuit and including

4   attorney's fees and costs in bankruptcy proceedings.

5   Accordingly, the provision is within the exception to the

6   American Rule as codified in Cal. Code Civ. Pro. § 1021 to allow

7   the attorney's fees pursuant to agreement of the parties.

8        A prevailing creditor is entitled to attorney's fees in a

9   § 523 action when the bankruptcy court adjudicates an action on

10  the contract and attorney's fees are provided pursuant to the

11  contract.  American Express Travel Related Servs. Co. v. Hashemi

12  (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir. 1996); Cal. Civ.

13  Code § 1717.  AT&T Universal Card Servs. v. Pham (In re Pham),

14  250 B.R. 93, 99 (9th Cir. BAP 2000) questioned the limitations of

15  Baroff and Hashemi and noted that "...after Cohen the

16  determinative question in cases under § 523(a)(2) is whether

17  the successful plaintiff could recover attorney's fees in a non-

18  bankruptcy court."  Id. (citing Santisas v. Goodin, 17 Cal. 4th

19  599, 608, 71 Cal. Rptr. 2d 830, 836 (1998) (depending on

20  the wording of the fee provision, there may be a contractual

21  right to recover attorney's fees in litigating tort claims)).  The

22  agreement grants attorney's fees to the prevailing party for

23  collection actions, and whether by a contractual term in the

24  agreement or alternatively as a punitive measure for compensatory

25  amounts expended by CDFI because of Mr. Londagin's fraud, CDFI is

26  entitled to its attorney's fees.  The pretrial order supersedes

27  the pleadings, and the parties have admitted that the terms of

28  the Note were breached and that certain amounts are due and

19

owing, including interest and attorney's fees.

Ninth Circuit law had long held that "where the litigated issues involve not basic contract enforcement questions but issues peculiar to federal bankruptcy law, attorney's fees will not be awarded absent bad faith or harassment by the losing party." Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1991). However, the Fobian Rule was recently overruled by the Supreme Court in Travelers Cas. and Sur. Co. of America v. Pacific Gas & Elec. Co., 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007). Travelers held that "the Bankruptcy Code does not disallow contract-based claims for attorney's fees based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." Id. The Court vacated and remanded the matter to the Ninth Circuit offering "no opinion as to whether other principles of bankruptcy law would provide an independent basis for disallowing the claim for attorney's fees." Id. at 1208. Travelers explains that "it remains true that an otherwise enforceable contract allocating attorney's fees (i.e., one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy unless the Bankruptcy Code provides otherwise." Id. at 1204. In this case, the majority of fees were incurred post-petition litigating the § 523 claims.

In its trial brief, CDFI argues that attorney's fees should be awarded as punitive damages citing Cohen v. De La Cruz, 523 U.S. 213, 218 (1998). In its supplemental brief, CDFI argues that "the Bankruptcy Court has adjudicated a contract action, and Plaintiff seeks an award of attorney's fees and costs due under that contract as punitive damages for fraud."

In California, punitive damages are permitted pursuant to Cal. Civ. Code § 3294 in an action for the breach of an obligation not arising from contract where fraud, oppression or malice is proven by clear and convincing evidence. The policy behind an award of punitive damages is to deter the conduct and make an example thereof. It is undisputed that the obligation arises from breach of the agreement.

Attorney's fees are awarded in the sum of $24,917.50 and costs of $1,946.92.

Counsel for the plaintiff shall prepare and lodge a judgment conforming to the foregoing Memorandum of Decision determining the debt of $58,235.25 to be nondischargeable as to Mr. Londagin only, plus interest at the California legal rate from May 6, 2006 until now, with the federal rate applicable thereafter, plus attorney's fees and costs in the total sum of $26,864.42. As to Mrs. Londagin, the complaint is dismissed on the merits, with no costs or fees awarded to her.

Date:   **MAR 2 7 2008**

David N. Naugle
Bankruptcy Judge

21

| In re | | Chapter 7 |
| | | Case No. RS 06-12181 DN |
| James J. and Debra A. LONDAGIN | Debtor(s). | |

| Southern California Reinvestment Fund, CDFI, | Plaintiff(s), | Adv No: RS 06-1271 DN |
| vs. | | |
| James J. and Debra A. LONDAGIN | Defendant(s). | |

### CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST LISTED BELOW OR ON THE ATTACHED SERVICE LIST:

    I hereby certify that I mailed a copy of this notice and a true copy of the foregoing order to the persons and entities named below or on the attached service list on (specify date):  March 27, 2008

Dated:  March 27, 2008

JON D. CERETTO
Clerk of the Bankruptcy Court

By _Linda Parnell_
    Deputy Clerk

David W. Brody, Esq.
9404 Genesee Avenue
Suite 320
La Jolla, CA 92037

Stephen R. Wade, Esq.
W. Derek May, Esq.
400 N. Mountain Avenue
Suite 214B
Upland, CA 91786

Steven Speier, Trustee
3403 Tenth St., Ste. 742
Riverside, CA 92501

U.S. Trustee
3685 Main St., Ste. 300
Riverside, CA 92501